IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

CHARLES DEAN GARNER                                                       PLAINTIFF

      v.                   Civil No. 6:08-cv-06031

SHERIFF LARRY SANDERS,
Garland County Detention Center;
and SGT. ANSLEY                                          DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Charles Dean Garner (hereinafter Garner) filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. Garner contends his constitutional rights were violated while he was incarcerated at the Garland County Detention Facility in Hot Springs, Arkansas. Specifically, he contends his rights were violated when he was denied adequate medical care and by the conditions to which he was subjected while confined there. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Robert T. Dawson, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

Defendants filed a Motion for Summary Judgment (Doc. 23). To assist Garner in responding to the Motion, a questionnaire was propounded (Doc. 26). Garner responded to the questionnaire (Doc. 27, Doc. 28, Doc. 29, Doc. 30)(collectively referred to as *Resp.* followed by the paragraph number). The Motion is now before the undersigned for issuance of this report and recommendation.

### I. Background

On January 26, 2008, Garner was arrested on a warrant for failure to appear, breaking and entering, and a hold for Saline County. *Resp.* at ¶ 1. He was booked into the Garland County Detention Facility (GCDF). *Id.* He was sentenced to a term of incarceration at the Arkansas Department of Correction (ADC) on May 5, 2008. *Id.* at ¶ 2. He was transported to the ADC on June 12, 2008.

Larry Sanders was during all times relevant to the complaint the duly elected Sheriff of Garland County, Arkansas. *Resp.* at ¶ 4. Sgt. Donald Ansley was at all times relevant to the complaint employed as detention facility supervisor of the GCDF. *Id.* at ¶ 5.

Dr. Kevin Hale is a medical doctor with a private practice located in Hot Springs, Arkansas. *Resp.* at ¶ 6. Dr. Hale has entered in an agreement to visit inmates in the custody of the GCDF who are in need of medical treatment. *Id.* at ¶ 8. He is paid on a per patient basis. *Defendants' Exhibit 1* at ¶ 7 (hereinafter *Defts' Ex.*).

Dr. Hale normally sees inmates at the GCDF at least once a week. *Defts' Ex.* 1 at ¶ 8. However, Garner maintains several of Dr. Hale's visits were canceled until the next week. *Resp.* at ¶ 9.

Garland County has a policy that requires the provision of medical care to inmates. *Defts' Ex.* 1 at ¶ 8; *Resp.* at ¶ 10(A)(without knowledge to agree or disagree). According to Defendants, in the case of an inmate who needs non-emergency medical care, the inmate is directed to complete a medical request form which is reviewed by a supervisor and then forwarded to Dr. Hale for review. *Defts' Ex.* 1 at ¶ 8. If the inmate needs to see the doctor, the inmate is scheduled an appointment

with Dr. Hale at his regular visit. *Id.* In emergency medical situations, inmates are either transported to the emergency room or an ambulance is summoned to provide emergency medical care to inmates. *Id.*

According to Garner, the paperwork doesn't always make it to Dr. Hale. *Resp.* at ¶ 10(B). Garner asserts that several medical requests he submitted are not in Defendants' record. *Id.* With respect to emergency medical care, Garner contends when he fell on March 4th, he requested that he be taken to the hospital because his neck burned and he was dizzy. *Id.* at ¶ 10(C). However, he states he was not given any medication or taken to the doctor. *Id.* He states he had headaches until the end of June. *Id.* He further states that GCDF does not follow all doctor prescriptions. *Id.* at ¶ 11. He notes that Sgt. Ansley has said they do not refill sleep aids. *Id.*

Garner submitted his first medical complaint on February 3, 2008. *Resp.* at ¶ 13(A). He stated his teeth were cutting into his tongue and jaw plus he wanted to be put back on his medicine. *Id.* In response, he was put on the list to see the doctor on Wednesday, February 6th. *Id.*

On February 6th Dr. Hale authorized Garner to be placed on Elavil 150 mg. daily. *Resp.* at ¶ 13(B). This was the same dosage Garner was on during his previous stay at the GCDF. *Id.*

Garner was seen by Dr. Fleishner, a dentist, on February 11th. *Resp.* at ¶ 14. He recommended that Garner be referred to an oral surgeon for extraction of two teeth. *Id.* He prescribed Penicillin VI 500 mg. and Ibuprofen for pain. *Id.*

On February 12th Garner stated the dentist gave him a prescription for penicillin and he had never gotten it. *Resp.* at ¶ 15. In response, a note was made that he started on the prescription that day. *Defts' Ex.* B at page 4. Garner states he was started on it February 13th. *Resp.* at ¶ 15.

His next medical complaint form was submitted on February 7th and he asked to be put back on Elavil. *Resp.* at ¶ 16. He stated he could not sleep at night. *Id.* His request was faxed to the doctor who prescribed Amitriptyline Tab 150 mg. for thirty days. *Id.*

On February 18th Garner submitted a medical complaint to be placed on a cold set up. *Resp.* at ¶ 17. In response he was given two Tylenol and one cold tablet three times a day for five days. *Id.*

On February 26th Garner complained his Asthma was giving him problems. *Resp.* at ¶ 18. He was seen by Dr. Hale on February 28th for asthma. *Id.* at ¶ 19. Dr. Hale prescribed an Albuterol inhaler, Methylpred Pak, and Penicillin. *Id.*

On March 4th Garner submitted a medical complaint because he slipped and fell on water in his cell. *Resp.* at ¶ 20. He said his neck was "burning." *Id.* Defendants maintain he was given Ibuprofen in response. *Defts' Ex.* B at page 6. Garner contends he did not received the Ibuprofen. *Resp.* at ¶ 20.

On March 5, 2008, Garner was seen by Dr. Cooper an oral surgeon and had two teeth removed. *Resp.* at ¶ 21(A). Dr. Cooper prescribed Penicillin and Hydroco/Apap tablets. *Id.* at ¶ 21(B). Dr. Cooper charged $625 for the work he performed that day. *Id.* at ¶ 21(C).

On March 6th Garner submitted a medical complaint. *Resp.* at ¶ 22(A). He stated he told the officers about this medical problem when he was booked in. *Id.* He stated his hernia was about to bust. *Id.* He was seen by Dr. Hale that day and prescribed Doxycycline and Kertorolac. *Defts' Ex.* D at pages 7-9. Garner maintains because all the dates contained on the medical complaint, treatment report, and on the prescriptions "look the same" that the paperwork looks doctored. *Resp.* at ¶ 22(B).

On March 11th Garner submitted a medical complaint on which he indicated his asthma was giving him problems.  *Resp.* at ¶ 23.  He also indicated he believed his blood sugar was giving him problems.  *Id.*  In response he was given medication for asthma.  *Id.*  He also requested Elavil again.  *Id.*  On March 13th, Garner was seen by Dr. Hale and prescribed Elavil 150 mg.  *Defts' Ex.* C at page 5.

On April 12th Garner asked to be placed on a cold set up.  *Resp.* at ¶ 25.  In response he was placed on a cold set up.  *Id.*

On April 18th Dr. Hale authorized a re-fill of Garner's Amitriptyline 100 mg.  *Resp.* at ¶ 26.  On April 29th Garner asked for a refill on his asthma inhaler.  *Id.* at ¶ 27.  He also asked to see the doctor about his ribs and back.  *Id.*  A refill on his inhaler was authorized and he was placed on the list to see the doctor.  *Id.*

On May 8th Garner submitted a request noting that Dr. Hale had changed his Elavil prescription to 150 mg. but he was still receiving 100 mg.  *Resp.* at ¶ 28.  He also stated that he had been receiving it at night and he wanted it after dinner.  *Id.*  In response, he was told the changes were made.  *Id.*

On May 9th a refill of Garner's Amitriptyline was obtained and a prescription for Diflofenac.  *Resp.* at ¶ 29.  On May 19th Garner submitted a request because of a rash he had in his beard and mustache.  *Id.*  The nurse suggested he shave but he refused.  *Id.*  He was given hydrocortisone cream for his face.  *Id.*  Garner states he only received one application of the cream and the rash spread to his head.  *Id.*

On May 22nd Garner complained he had a spider bite or staph infection on his leg. *Resp.* at ¶ 31. He asked to see the doctor. *Id.* In response a request for antibiotics was faxed to the doctor. *Id.* Garner states he received the antibiotics although he maintains it was days later. *Id.*

On June 1st Garner complained the rash he had on his beard was now on his head. *Resp.* at ¶ 32. He asked that it be checked out. *Id.* In response he was put on the list to see the doctor on Thursday. *Id.*

Garner maintains he did not receive Elavil on the following dates: March 11th-March 12th; March 18th-April 1st; April 15th-April 29th; and June 9th. *Resp.* at ¶ 33. He also maintains he was told by Sgt. Ansley that they would not refill sleep aids and that he didn't need to see the doctor about sleep aids. *Id.* at ¶ 34 & ¶ 36. Garner maintains Elavil is not a sleep aid but an agitation/anxiety/depression medication. *Id.*

With respect to the condition of the cells, Garner maintains some of the cells had no running water. *Resp.* at ¶ 37. In other cells, he states the toilets didn't flush and leaked sewer water. *Id.* at ¶ 37. He indicates his clothing was always falling off from poor waistbands or had ripped up legs. *Id.* at 38(B). If they didn't have his size, he didn't get clean clothing until the next week. *Id.*

Garner had a bunk or mattress to sleep on. *Resp.* at ¶ 38(C). He was provided a diet sufficient to maintain his health. *Id.* at ¶ 38(D). He could send and receive mail. *Id.* at 38(E). Garner didn't exercise because he was always fatigued, hurt from falling, or his teeth bothered him too much. *Id.* at ¶ 38(E). He was able to shower on a regular basis and had access to basic hygiene items such as soap and water between showers. *Id.* at ¶ 38(G).

Garner fell on March 4th because of water leaking from the commode. *Resp.* at ¶ 44. The commode had been leaking since he was booked in on January 26th. *Id.* He reported the leaking commode. *Id.* It was still leaking when he was transferred to the ADC on June 12th. *Id.*

Garner indicates an inmate tried to repair the leaks throughout the pod but failed. *Resp.* at ¶ 47. At night fresh "water blankets" are passed out and the old ones picked up. *Id.* The blankets are used to soak up the water. *Id.* There were times the water ran out of the cell and across the day room floor. *Id.*

When he fell, he received a knot on his head with a cut on top of it, a sore neck, and had bad headaches for months. *Resp.* at ¶ 45. He also had a loss of appetite, a burning neck and back, an aching head, and dizziness. *Id.* He requested treatment but his request was refused and he was sent back to his cell. *Id.* He still has headaches from time to time. *Id.* Before this, Garner maintains he never had headaches. *Id.* Two other inmates have fallen as a result of the leaking plumbing, Rodney Blocker and Cory Blevins. *Id.*

## II. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  The Arguments of the Parties

Defendants maintain contend Garner can present no set of facts demonstrating that either one of them exhibited deliberate indifference to Garner's serious medical needs. Similarly, Defendants deny that they acted with deliberate indifference towards conditions at the jail that created a substantial risk of serious harm. Finally, they maintain Garner cannot prove any custom or policy of Garland County led to the alleged constitutional violations.

Garner argues he was denied adequate medical care when he was not provided medical attention after his slip and fall and when he was denied Elavil on multiple occasions. Further, he maintains he was subjected to unconstitutional conditions of confinement primarily because of the inadequate and leaking plumbing at the facility.

### IV.  Discussion

As noted above, Defendants have moved for summary judgment on both of Garner's claims. I will address each claim separately.

#### A. *Denial of Adequate Medical Care*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d

340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Garner must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

With respect to the dates on which Garner maintains he did not receive Elavil, I believe there is a genuine issue of fact as to whether there is deliberate indifference on the part of Defendant Ansley. Garner first received a prescription for Amitriptyline[1] on February 8th. *Defts' Ex.* D at page 1. The prescription was for thirty days with no refills authorized. *Id.* On March 13th, Garner was then seen by Dr. Hale who prescribed Elavil. *Defts' Ex.* C at page 5. The prescription was obtained

---

[1] Amitriptyline is a type of prescription medication used to treat depression and anxiety disorders. Elavil is one of the brand names under which this medication is sold.

the same day. *Defts'* Ex. D at page 10. The prescription was for a thirty day supply with no refills authorized. *Id.* Prescriptions were again filled on April 18th and May 9th. However, there are two fairly lengthy periods of time (March 18th to April 1st and April 15th to April 29th) when there are no inmate medication ledgers submitted by Defendants indicating that Garner was provided the medication prescribed to him by Dr. Hale. Garner maintains Defendant Angley "took [the] meds doctor prescribed." *Resp.* at ¶ 48.

Given the lack of records regarding whether or not Garner received the Amitriptyline prescribed to him by Dr. Hale for a portion of the time, I believe there are genuine issues of material fact as to whether Ansley exhibited deliberate indifference to Garner's serious medical needs. Garner maintains Ansley considered the Amitriptyline to be merely a sleep aid and denied him access to the medication. *See e.g.,* Doc. 5 at page 1 (Medical Complaint Dated 3/6/08 and responded to by Ansley: "For further reference, you have only a few days left on Elavil. WE WILL NOT!! Refill–We will not provide sleep aids!! Do not send anymore requests for Elavil when you run out); (Grievance Dated 3/9/08 and responded to by Ansley: "You had No Refills, we will not refill sleeping aids. You ran out! It was not taken from you. You have seen the doctor numerous times the last couple weeks. No more grievances will be answered concerning this matter."). While the record indicates the medication was purchased, it does not indicate Garner was always provided with the medication. In fact, as noted above, there are two fairly lengthy periods of time, March 18th to April 1st and April 15th to April 29th, when there is nothing to establish Garner received his medication and Garner denies that he received it.

Moreover, the record indicates Ansley was involved in the decision of whether or not Garner should see the doctor or be given medical treatment. Following his fall on March 4th, Garner submitted a medical request asking to see a doctor. Ansley in response wrote: "No action."

However, with respect to Sheriff Sanders, I find no basis on which he may be held liable exists. There is no evidence Sheriff Sanders was personally involved in making any decisions regarding Garner's medical care. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

### B. *Conditions of Confinement*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the

"wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case. Garner had a bunk or mattress to sleep on. His diet was sufficient to maintain his health. He had clothing although the waistbands were poor or the legs were ripped up. He could send and receive mail. He could exercise but did not because of his health. He was able to shower on a regular basis and had access to basic hygiene items between showers.

By far the biggest problem identified by Garner were the plumbing problems in the jail. He indicates that the cells did not have running water and three did not have toilets that flushed. The cell he was confined in had a toilet that leaked. Water on the floor from the leak is what caused him

to slip and fall on March 4th. He asserts two other inmates had fallen in the jail because of the water leaking.

In response to problems about the leaks, Defendants had a plumber trying to fix what they could. *Resp.* at ¶ 39; Doc. 8 at page 2. He was told the plumber was working as fast as he could with the equipment in the jail and the parts being out dated. *Id.* Garner also indicates inmates tried to fix the plumbing. *Resp.* at ¶ 47. Additionally at night fresh "water blankets" were passed out and the old ones were collected. *Id.* The "water blankets" were used in an effort to soak up the leaking water so it would not spread across the floor. *Id.*

I do not believe there are any genuine issues of fact as to whether Defendants acted with deliberate indifference towards Garner's safety. Garner concedes that efforts were being made to repair the plumbing problems at the GCDF and that the efforts were hampered by the fact that the plumbing was out dated. He also agrees that in the meantime efforts were made to soak up the water and keep it from being a hazard. There is simply nothing to suggest the Defendants failed to act in the face of a risk of harm to the health or safety of the detainees at the GCDF. *See e.g., LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)("slippery prison floors . . . do not state even an arguable claim for cruel and unusual punishments")(citation omitted).

"[E]very injury suffered by an inmate does not necessarily translate into constitutional liability for prison officials." *Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996). While I do not hold that slippery floors or faulty and leaking toilets can never establish a claim of constitutional dimension, I believe that under the circumstances of this case no claim of constitutional dimension is stated. *See e.g., Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998)(inmate was on crutches and fell and injured himself several times--his repeated injuries and unsafe conditions state a claim where

slippery floors without protective measures create sufficient danger). There is simply nothing in the summary judgment record to support a finding that Defendants failed to maintain a safe area for the detainees or that they were aware there was a substantial risk detainees would fall because of the leaking toilets and that a fall would cause serious harm. *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 110 (8th Cir. 1998)(Plaintiff must prove the officials knew of facts from which they could infer a substantial risk of serious harm existed and that the officials drew that inference).

### V. Conclusion

I therefore recommend that the Motion for Summary Judgment (Doc. 23) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to Garner's unconstitutional conditions of confinement claim and his denial of medical care claim against Sheriff Sanders. This leaves for later resolution Garner's denial of medical care claim against Sgt. Ansley.

**The parties have ten (10) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 20th **day of July 2009.**

                                                /s/ Barry A. Bryant
                                                HON. BARRY A. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE